UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

JODY AND RICHARD GARCIA,                                Case No. 17-12100-t11

    Debtors.

## OPINION

Before the Court is Debtors' motion to convert their chapter 11 case to chapter 7 and their main creditor's motion to dismiss. The dispute turns on whether Debtor's obligation to the creditor is a "consumer debt." If it is, then upon conversion Debtors would face the argument that the case should be dismissed for substantial abuse under 11 U.S.C. § 707(b). If the obligation is not a consumer debt, on the other hand, conversion presents no such obstacle. The Court holds that the debt is not a consumer debt. The motion to convert therefore will be granted and the motion to dismiss denied.

I.     FACTS[1]

The Court finds:

Jody Garcia's father, Bruce Cantrell, is an engineer. He owned a successful engineering firm, Energy Controls, Inc. ("ECI"), located in Albuquerque, New Mexico. At its height ECI generated $50 million in annual revenue. Mr. Cantrell retired in 2003. He sold ECI for $3,000,000 ($1 million in cash and $2 million over time).

---

[1] The Court took judicial notice of its docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may sua sponte take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

The Cantrells owned a 563-acre ranch near La Veta, Colorado. In 2005 they decided to buy an additional 42 acres next to the ranch for $475,000. They financed the purchase with a loan from First National Bank in Trinidad. At the time, their ranch was encumbered by a $225,127 mortgage. The Cantrells refinanced the mortgage with the bank when they borrowed the $475,000, resulting in a single new loan of $772,000 that was secured by a first deed of trust on the ranch.

Despite their efforts to make the ranch profitable, the Cantrells managed only to break even on ranching operations. The ranch arguably is closer to a hobby ranch than a working ranch.

In 2009 the Cantrells began talking to a Mike Balloun about buying the Cuchara Mountain ski area near La Veta.[2] On June 9, 2009, the Cantrells took out a $320,000 home equity line of credit ("HELOC") from the bank, secured by a second deed of trust on the ranch. The deed of trust did not encumber the Cantrells' house on the ranch, which was intentionally "carved out" of the encumbered property description. The Cantrells eventually spent between 50% and 67% of the HELOC proceeds on the ski area.[3]

As part of the contemplated ski area purchase, the Cantrells wanted to borrow an additional $700,000 from the bank. In a March 23, 2010, letter from Mr. Cantrell to the bank, he said:

> As requested in your email the following is the plan for payments on our loan after the Energy Control payout is completed:
>   1. Under the Cuchara Valley Recreation Budget (see attached) I will be reimbursed $30,000 in phase one (at funding) for attorney fees and an additional $1,350,000 in phase three (end of year one) and start of construction of the reservoir.
>   2. If funding fails to materialize for the recreation area we will still be selling adjudicated water for augmentation to those parties that are in need of this water. For example we are currently in negotiations with a national drilling firm for over

---

[2] The ski area consisted of about 225 acres, of which 50 acres or so contained the ski runs, lifts, etc. Much of the remaining acreage was subdivided and intended for residential development. Mr. Cantrell's business plan was to try to break even on the ski mountain operations and sell the residential lots at a profit.

[3] Mr. Cantrell testified that he spent $188,000 of HELOC money on the ski area even though he had not bought it yet, apparently to construct a water reservoir to be used by the ski area.

20 acre feet of water at a substantial price. We expect this type of demand to increase in the next year. These funds will be used to repay of meet payment [sic] well into the future. . . . .

On or about March 24, 2010, Mr. Cantrell attended a two-hour meeting with the bank's loan committee to explain his loan request. At the meeting Mr. Cantrell presented his business plan for the ski area. Mr. Cantrell swore the committee members to secrecy because he was in the middle of negotiating to buy the ski area. The March 24, 2010, loan committee minutes state that the purpose of the loan was "to build a reservoir at the ski basin and consolidate their other loans."[4] The bank's loan committee notes from April 7, 2010, indicate that one source of repayment of the consolidated loan could be from water rights associated with the ski area.[5]

As part of his plan to reopen and expand the ski area into an all-seasons resort, Mr. Cantrell prepared a detailed, 16-page business plan. The plan hinged on raising $8,000,000 from foreign investors. If the development was successful, Mr. Cantrell projected land sales of $18,000,000, together with an additional $3,000,000 in resort net operating income generated during the first five years of operation.

The bank's loan committee approved the loan on April 7, 2010. The loan was funded on May 4, 2010, memorialized by a $1,650,000 promissory note that consolidated the two existing loans with the new loan. Payment of the new note was secured by a first deed of trust on the ranch property (again excluding the Cantrells' house).[6]

---

[4] Apparently the reservoir was to be built on the ranch property, but would hold the water needed by the ski area to make snow.
[5] "The water would still benefit the ski area and he could also sell water rights down stream as needed. . . Strength is in the marketability of the water and not relying on the buildup of the ski area. Loan approved."
[6] Because the collateral excluded his house, Mr. Cantrell characterized the loan as a "land loan" as opposed to a home mortgage loan.

The Cantrells' purchase of the ski area from Mr. Balloun closed in September 2010. The Cantrells paid Mr. Balloun $100,000 in cash, signed a promissory note for $1,727,193, mortgaged their Albuquerque house to secure payment of the note, and assumed about $800,000 of debt encumbering the ski area.

In January 2011 the Cantrells borrowed an additional $150,000 from the bank, secured by a second deed of trust on the ranch. The purpose of the loan was to pay tax liens encumbering the ski area. The interest rate was a variable rate tied to the bank's "current commercial-agricultural rate on loans of this type." The loan matured April 6, 2011.

The Cantrells were unable to repay the $150,000 loan when it came due. According to the bank's loan committee minutes, the Cantrells asked for a 90-day extension, saying they

> will be re-filing for funding to complete the Cuchara Mountain Resort project. If they do not receive the funds, their loan will need to be placed on monthly payments.

The Cantrells were not able to obtain the funding. On July 18, 2011, they refinanced the $150,000 note with a term note for $154,383.10, requiring 83 monthly payments of $915.48 and a "balloon" payment of $137,191.34 on July 18, 2018.

During this time the bank's regulators took notice of the Cantrell loans. Because of the size of the loans, the Cantrells' limited income, and their large debt to Mr. Balloun, the regulators categorized the loans as "criticized." They were the largest criticized loans held by the bank.

Under considerable collection pressure from Mr. Balloun, the Cantrells sold their Albuquerque house and paid Mr. Balloun the net proceeds. The payment brought the ski area note balance down to about $1,400,000.

In early 2013 Mr. Cantrell negotiated a deal with Mr. Balloun to extinguish the ski area note in exchange for the conveyance to two 35-acre parcels of the ranch and certain water rights. As the parcels were mortgaged to the bank, the bank's agreement was required.

In January 2013, the loan officer in charge of the loans presented to the loan committee the Cantrells' request that the bank release the two 35 acre parcels. In a January 25, 2013, email to Mr. Cantrell, the loan officer stated:

> Committee is aware that there are numerous tax liens on the ski area. They are concerned you may try to borrow to pay off the tax liens or borrow to do improvement to the ski area. I did the best I could to assure them if you are successful in resolving the Balloun loan that you did not ever again want to find yourself in the position that [sic] are currently in. I did tell them about the possibility of foreign investors buying the resort because of the citizenship benefits they might receive. I also told them that even if you lost the ski area to tax liens at least you would have Balloun and his treats [sic] out of your life.
>
> I was reminded by committee that currently your loan is the largest criticized asset we have. The criticism comes from our Federal regulators. . . . .
>
> One of the reasons this loan is criticized is because you do not have enough income to service your debt with us and Balloun. So the point was made, Balloun will go away if we are willing to release 70 acres. The come back was even with you no longer having to deal with Balloun, your present income compared to the debt with our bank and any other personal obligations, debt service to income is still very tight and the Feds will not allow this loan to be taken off of the criticized asset list. . . .
>
> Committee is willing to consider releasing the two lots as you have requested if you can provide more qualified signers on the note.

The Cantrells' request for the bank to release the two lots and the bank's request for a co-signer were discussed in loan committee meetings held on January 24, 2013, February 6 and 13, 2013, and March 20, 27, and 28, 2013.

Mr. Cantrell approached his daughter Jody Garcia about co-signing the loans. When asked why she considered the request, Ms. Garcia testified:

> Well, I think [my father] has a pretty lengthy track record over his life. I mean, I'll be the first to admit, he's an entrepreneurial spirit. He – he has a huge heart, and I think that's what particularly appealed to me out of this particular venture that he was working on, the ski area, because it was really about helping – employ the

people and build up the economy. You know, so he's – he's – all his life he's had very big dreams, but he's been very successful too. . . .

This is bigger than anything that I would have ever contemplated as a request, and so that's why we specifically talked about – you know, let's – let's see what we can do to build the little joint venture deal, because that's a lot of risk that I felt that I was taking on in that moment. So there has to be at least a little something in it for me. That was the feeling I had at the time.

Ms. Garcia had several conversations with her father about the proposal to add her to the loans as a co-signer. During one conversation, held in early 2013, she took notes, which included the following:

> 3. **What's in it for me**? Any money lent toward project to be reimbursed. 10% of net profit once ski area operating. Interest on money lent as same rate of loans.
> 4. **How much risk do I have**. Should be minimal. Still have income from ECT and Life Insurance Policy. Will sell ranch if required.

Ultimately, Ms. Garcia agreed to co-sign the notes. At the time, her income was about $500,000 per year. The bank, desperate to increase the quality of the loans and get them off the "criticized" list, welcomed Ms. Garcia as a co-signer and did not ask about her motivations.

Ms. Garcia signed an "Endorsement Agreement" on March 29, 2013, undertaking the obligations of an endorser on the two notes.[7] The Endorsement Agreement was drafted by the bank's counsel.[8]

---

[7] She also signed the two original promissory notes and the July 13, 2011, truth in lending disclosure statement.

[8] The Endorsement Agreement contains the following recitals:
> WHEREAS: Jody is the daughter of A. Bruce Cantrell and Joan D. Cantrell who are experiencing financial difficulties and their daughter, Jody desires to assist them in their time of need.
> WHEREAS: A. Bruce Cantrell and Joan Cantrell have requested that the Bank release a portion of their real estate which is encumbered by a deed of trust held by the Bank.
> WHEREAS: The Bank requires additional security prior to releasing any portion of the real estate held as security for its two notes, and will accept Jody as an endorser of said notes as an additional security
> . . . .

When the transaction closed, Ms. Garcia delivered the endorsement agreement; the bank released the two 35-acre parcels; the Cantrells conveyed the parcels and water rights to Mr. Balloun; and Mr. Balloun extinguished the ski area note. Lawyers representing the bank, Mr. Balloun, and the Cantrells were involved in this unusual "four-cornered" transaction.[9]

As part of the deal, the bank required Ms. Garcia to provide annual financial statements and tax returns until the loans were paid in full. That is not a requirement seen in consumer lending.

An unwritten part of the transaction was Ms. Garcia's agreement with her father that if Ms. Garcia ever had to make a payment on the loan, Mr. Cantrell would reimburse her for the payment, plus interest. They also agreed that Ms. Garcia would be entitled to ten percent of the ski area profits.[10]

Debtors were forced to begin making payments on the loans immediately. The first payment ($5,000) was made in March 2013, followed by payments in April 2013 ($10,000), July 2013 ($5,000) and October 2013 ($5,000). Overall, the Debtors paid $287,775 to the bank under the Endorsement Agreement.

In February 2016 the Cantrells wrote a letter to the bank asking that it show Ms. Garcia as the borrower on the IRS form 1098 (Mortgage Interest Statement). The bank complied and Ms. Garcia deducted the interest she paid on the loans from her taxable income. She could only have taken the deduction for a business or investment interest expense.

Debtors filed this case as a chapter 7 case in August 2017. In November 2017 the Bank moved to dismiss the case under 11 U.S.C. § 707(b). On September 25 and 26, 2018, the Court

---

[9] i.e., Ms. Garcia, the Cantrells, the bank, and Mr. Balloun.
[10] It is unclear whether the "profits" related to resort operations, the sale of residential lots, or both. However, Mr. Cantrell testified credibly that he thought most or all of the profit would come from lot sales, and that is what he intended to share with Ms. Garcia.

held an evidentiary hearing on the Bank's motion to dismiss. At the hearing it became clear that Debtors had not scheduled the Cantrells' obligations under the oral joint venture agreement. The Court admonished Debtors and their counsel to correct this significant omission promptly (which they did). At the conclusion of the hearing, the Court took the motion to dismiss under advisement.

Two days later Debtors moved to convert their case to chapter 11, representing among other things that Ms. Garcia's father was then "attempting to sell property for enough money to pay [the bank] in full." Debtors' motion to convert was unopposed, so on November 5, 2018, the Court converted the case to chapter 11.

Unfortunately, the hoped-for sale did not materialize. A forest fire damaged the ranch to some unknown extent. The bank representative testified that he did not think the buyer was ever really serious about closing the sale. In any event, on April 4, 2019, Debtors moved to reconvert to chapter 7. The Court held a hearing on Debtors' motion to convert on June 14 and June 20, 2019.

## II.    DISCUSSION

A.    <u>Is the Endorsement Liability a Consumer Debt</u>?

Section 101(8) defines consumer debt as a "debt incurred by an individual primarily for a personal, family, or household purpose."

Some debts clearly are consumer debts, such as debts incurred to buy or improve a home. *In re Palmer*, 117 B.R. 443, 447 (Bankr. N.D. Iowa 1990). Debts arising from a divorce judgment, including alimony and child support, are consumer debts. *In re Kestell*, 99 F.3d 146, 149 (4th Cir. 1996) (divorce-judgment debt) and *In re Grillot*, 578 B.R. 651, 657 (D. Kan. 2017) (support obligation). Attorney fees incurred in attempting to further a family or household purpose are consumer debts. *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988) (discussing attorney fees).

Conversely, other debts plainly are not consumer debts. Debts incurred with a profit motive are not consumer debts.[11] *In re Stewart*, 175 F.3d 796, 806 (10th Cir. 1999); *Citizens Nat'l Bank. v. Burns (In re Burns)*, 894 F.2d 361 (10th Cir. 1990); *In re Booth*, 858 F.2d 1051, 1055 (5th Cir. 1988) (non-consumer debt is incurred with "an eye toward profit"). Likewise, debts for business ventures and commercial transactions are not consumer debts. *In re Millard*, 585 B.R. at 186; *In re Manning*, 126 B.R. 984, 989 (M.D. Tenn. 1991) (debts for investment are not consumer debts); *In re Traub*, 140 B.R. 286, 289 (Bankr. D.N.M. 1992) (credit card debt used solely for business is non-consumer debt).

Ms. Garcia's endorsement liability does not fall neatly into either category. Case law provides some guidance to determine how debts in the "gray area" should be classified.

Consumption. The tie between consumer debts and "consumption" is both significant and commonsensical. In *In re Manning*, the district court held that consumer debts are those incurred for the consumption of the necessities or luxuries of daily existence. 126 B.R. at 989; *see also In re Straughter*, 219 B.R. 672, 682 (Bankr. E.D. Pa. 1998) (citing *Manning* and stating that to qualify as a consumer debt, consumption must be involved); *In re Circle Five, Inc.*, 75 B.R. 686, 688 (Bankr. D. Idaho 1987) (normal consumptive activity by an individual was the benchmark used to determine whether a debt is a consumer debt); *In re Costantino*, 72 B.R. 189, 192 (Bankr. D.S.C. 1986) (same).

Absence of a Profit Motive is not Dispositive. Several courts have held, correctly it seems to the Court, that while debts incurred with a profit motive clearly are not consumer debts, the

---

[11] It should be noted that a profit motive does not mean that a profit will result. *In re Millard*, 585 B.R. 182, 186 (Bankr. D. Utah 2018) (although the "case law . . . distinguishes non-consumer debt as 'debt incurred with a profit motive' or 'on behalf of a business venture and commercial transaction[,]'" . . . "profit *motive* does not mean profit *realized*.") (emphasis in original).

reverse is not true: a debt that is not incurred with a profit motive may, or may not be, a consumer debt. *In re Grillot*, 2017 WL 4286882, at *4 (Bankr. D. Kan.); *In re Brashers*, 216 B.R. 59, 61 n. 2 (Bankr. N.D. Okla. 1998).

Purpose. "[T]he key factor in determining whether secured debt is consumer debt lies in the *debtor's* purpose in incurring" it. *In re Cherrett*, 523 B.R. 660, 670 (9th Cir. BAP 2014) (emphasis in original). In determining a debtor's purpose for incurring a debt, the Court must examine the totality of the circumstances as they existed at the time that the obligation was incurred. *Millard*, 585 B.R. at 187.

Involuntary Debts. Involuntary debts like taxes are not consumer debts. *Internal Revenue Serv. v. Westberry*, 215 F.3d 589, 591 (6th Cir. 2000) (taxes are involuntary, are incurred for a public rather than personal or household purpose, and arise from the earning of money instead of its consumption); *Brashers*, 216 B.R. at 60-61 (same).

Tax Benefits. Obtaining a financial advantage like a tax write-off is indicative of a business debt. *Manning*, 126 B.R. at 987-89 (debt to buy commercial real estate, with the intent to benefit from tax write-offs, is not a consumer debt, even if an incidental beneficiary of the real estate purchase is debtor's sister).

Guaranty Obligations. A few cases have addressed guaranty obligations similar to the endorsement liability at issue here. In *In re Jelinger*, 2014 WL 996266, *4 (Bankr. N.D. Ohio) the court held that, as a general proposition, "debts relating to guarantees on corporate debt . . . are not consumer debts." In *In re SFW, Inc.,* 83 B.R. 27 (Bankr. S.D. Cal. 1988), the bankruptcy court held that a guarantee of farming corporation debt by its shareholders is not a consumer debt. In *In re Grillot*, 578 B.R. 651 (Bankr. D. Kan. 2017), the court ruled that an ex-husband's guarantee of his ex-wife's real estate development project was a business debt, even though the guarantee

allowed him to avoid making alimony payments, because he had a profit motive in signing the guarantee, namely the preservation of his professional reputation, which was associated with the development. Finally, in *In re Straughter*, the court held that a wife's guaranty of a loan to her husband's business was not a consumer debt "[b]ecause the debt at issue was not used by either debtor in any consumer capacity[.]" 219 B.R. at 682.

Strict Construction. One court has held that the definition of "consumer debt" should be strictly construed. *In re Costantino*, 72 B.R. at 192.

The court evaluates the factors emphasized in the foregoing cases as follows:

| Factor | Discussion |
| --- | --- |
| 1. Was the debt incurred to obtain goods or services for the necessities or luxuries of daily living? | No. The purpose was unlike any typical consumer purpose. No consumption was involved. Ms. Garcia did not receive any funds with which she could buy consumer or other goods. |
| 2. Was there a profit motive? | Yes. It was not the only motive: Ms. Garcia clearly wanted to help her father with his ski area redevelopment project. However, she was only willing to do so in exchange for the joint venture arrangement outlined above. |
| 3. What was the purpose of incurring the debt? | Again, the purpose was mixed. Ms. Garcia's purpose was to help her father but also to profit from doing so. |
| 4. Was the debt incurred voluntarily or involuntarily? | The debt was voluntary. |
| 5. Did the debtor obtain any tax or other financial benefits? | Yes. Ms. Garcia was able to deduct the interest she paid from her taxable income. This she could only do if the interest was paid in connection with a business. |
| 6. Did the endorsement guarantee a business debt? | Primarily, yes. The original $772,000 may be a consumer debt, because the ranch may be considered a "hobby ranch." About half of the HELOC loan was for private or consumer purposes. The rest of the debt was incurred to buy and develop the ski area. In rough numbers, about $823,000 could be considered consumer debt, while about $981,000 is business debt. If the ranch loan is deemed to be |

|  | a business loan, then almost all of the guaranteed debt is business debt. |
|---|---|

In addition to the factors discussed above, the Court thinks it important to note that the endorsement transaction bore little resemblance to a typical consumer loan. The transaction was complicated, requiring substantial "lawyering" by three parties. Mr. Cantrell's purchase of the ski area was a large, commercial deal. The bank's loan committee was intimately involved in obtaining Ms. Garcia's endorsement and releasing the two 35-acre parcels of collateral. The bank's regulators were watching the loans carefully. Ms. Garcia assumed continuing obligations to provide financial statements and income tax returns. The typical consumer loan, in contrast, uses form documents, does not require lawyers, does not involve loan committees, and does not involve bank regulatory scrutiny. Consumer borrowers do not have continuing obligations to provide financial information. Consumer loans generate funds used to buy consumer goods or services.

Considering all the facts of the case, the Court concludes that Ms. Garcia's endorsement liability is not a consumer debt. Only one aspect of the transaction weighs in favor of finding that it is: Ms. Garcia signed the endorsement agreement in part to help her father. The remaining facts about the transaction, e.g., the unusual, complicated nature of the transaction; the fact that no consumption was involved; the fact that Ms. Garcia negotiated reimbursement, interest, and a 10% joint venture interest in exchange for the endorsement; and the fact that Ms. Garcia obtained substantial tax benefits available only for business interest expense, all tip the balance solidly in favor of concluding that it is not a consumer debt.

B.   <u>Section 707(b) Does Not Apply</u>.

Section 707(b) provides in part:

> [a]fter notice and a hearing, the court on its own motion or on a motion by . . . any party in interest, may dismiss a case filed by an individual debtor under [chapter 7] whose debts are *primarily consumer debts*, or with the debtor's

> consent, convert such a case to a case under chapter 11 or 13 . . . if it finds that the granting of relief would be an abuse of the provisions of [chapter 7].

(emphasis added). Because the endorsement liability is not a consumer debt, Debtors' debts are not primarily consumer debts.[12] Thus, § 707(b) does not apply. *See, e.g., In re Lobera*, 454 B.R. 824, 837-38 (Bankr. D.N.M. 2011) (Section 707(b) applies only to "consumer debtors"); *In re Peterson*, 524 B.R. 808, 813 (Bankr. S.D. Ind. 2015) ("Section 707(b) applies only to individuals whose debts are primarily consumer debts."). The Bank's motion to dismiss under Section 707(b) must be denied.

C.  Debtors' Motion to Convert Should Be Granted

Debtors seeks to reconvert to chapter 7 because a favorable ranch sale no longer appears likely. The relevant Code section, § 1112(a) provides:

> The debtor may convert a case under this chapter to a case under chapter 7 of this title unless—
> (1) the debtor is not a debtor in possession;
> (2) the case originally was commenced as an involuntary case under this chapter; or
> (3) the case was converted to a case under this chapter other than on the debtor's request.

"Section 1112(a) appears to give the debtor an absolute right to convert a chapter 11 case to a case under chapter 7, provided that none of three limited exceptions apply." 7 Collier on Bankruptcy ¶ 1112.02 (16th ed.) (footnotes omitted). Later, Collier notes that there is an "extraordinary circumstances" exception to the apparent absolute right. *Id.* at ¶ 1112.06[6], n.25 and accompanying text.

The Court does not find any extraordinary circumstances here. Debtors converted to chapter 11 in the hope that the ranch could be sold for enough money to pay off the bank. In

---

[12] Debtors amended schedules show total debts of about $2,350,000. Of those, about $1,793,000, or 76.3%, are not consumer debts.

retrospect, that belief may have been naïve or unrealistic, but the Court does not question the genuineness of the belief. It now appears, and the bank concedes, that a sale for enough to pay the bank loans in full is unlikely in the foreseeable future. In this situation, conversion is fully consistent with good faith.[13]

### III. CONCLUSION

Weighing all the evidence, the Court concludes that Ms. Garcia's endorsement liability to the bank is not a consumer debt. Because of that, § 707(b) does not apply. The motion to convert is brought in good faith. By separate orders, the Court will grant the motion to convert and deny the motion to dismiss.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: October 11, 2019

Copies to: electronic notice recipients

---

[13] The bank obtained one significant benefit while the case was in chapter 11—the Cantrells mortgaged their house on the ranch as additional collateral for the loans.